**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

JAMES HAYWARD LESTER                     CIVIL ACTION NO. 15-2008

VERSUS                                            JUDGE S. MAURICE HICKS, JR.

CADDO PARISH, ET AL.                          MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

Before the Court are Defendants Lea Hall, Jr. ("Hall") and Charles R. Scott's ("Scott") Motions to Dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (Record Documents 15, 20) regarding Plaintiff James Hayward Lester's ("Lester") allegations in his Complaint (Record Document 1) alleging federal constitutional violations under 42 U.S.C. § 1983, Louisiana constitutional violations, and state tort claims against these Defendants. For the reasons which follow, Defendants' 12(b)(6) Motions to Dismiss are **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

Lester is a resident of Tarrant County, Texas, but for many years has been active as a commercial contractor in Shreveport. See Record Document 1 at 1-4. On February 28, 2003, Lester first filed his application for a Louisiana commercial contractor's license in Shreveport. See id. at ¶ 13. This application included a statement that Lester had never been convicted of a felony or misdemeanor; in fact, Lester had previously been convicted of a misdemeanor in Texas. See id. at ¶ 25; see also State v. Lester, 165 So.3d 1181 (La. App. 2 Cir. 05/20/16). Lester received a valid commercial contractor license on May 15, 2003. See Record Document 1 at ¶ 14. He continually reapplied for such a license and held a valid license during all times relevant to this case. See id. at ¶ 15.

Part of Lester's contracting work involved making repairs to houses of people who applied for grants from the City of Shreveport's Bureau of Housing and Business Development. See id. at ¶ 16-17. Lester would submit a bid for the requested work and, if he had the lowest bid, he would receive the contract to perform the work. See id. In October 2007, Lester was awarded the contract to perform work on Ms. Bessie Lee Broadway's ("Broadway") home. See id. On January 14, 2008, a change order for the original contract was approved, allowing Lester to receive an additional fee of $5,100 for additional work. See id. at ¶ 21. On January 24, 2008, Lester, Broadway, and City Inspector Daniel Lacour ("Lacour") executed a "Contractor's Pay-Out Request" to pay Lester $17,900 for work that Lester had completed. See id. at ¶ 20.

On March 8, 2008, Lacour and Lester orally agreed to a second change order which would allow Lester to repair and service the furnace in the home rather than replace it entirely and use the money that would have paid for a new furnace to replace a deteriorated wall. See id. at ¶ 22. Lacour later admitted that he forgot to complete a physical change order for these changes. See id. On April 1, 2008, Lester, Broadway, and Lacour executed a second "Contractor's Pay-Out Request" to pay Lester $7,090 for the remainder of the work that Lester had completed. See id. at ¶ 23.

On March 19, 2009, Sergeant Jason Turner ("Turner") of the Louisiana State Police and Sergeant Jay Long ("Long") and Corporal John May ("May") of the Caddo Parish Sheriff's Department began an investigation into Lester's activities as a contractor. See id. at ¶ 24. During the investigation, Turner found Lester's previous misdemeanor conviction and received documents related to the repairs Lester completed on Broadway's house. See id. at ¶¶ 24-27. On July 15, 2009, Turner obtained a warrant for

Lester's arrest for Filing or Maintaining False Public Records by submitting renewal applications for his contractor's license without correcting the statement that he had not been convicted of a previous misdemeanor. See id. at ¶ 28.

Turner, Long, and May continued their investigation of Lester by inspecting Broadway's property with another inspector, Timothy Weaver ("Weaver"). See id. at ¶ 29. Weaver later sent a letter to Turner stating that he found that Lester had failed to install as much insulation in Broadway's attic as the contract had called for. See id. at ¶ at 30. On August 29, Turner obtained an arrest warrant for Lester and Lacour's arrest for Home Improvement Fraud. See id. at ¶ 31. In interviews with the officers after the arrest warrants were issued but prior to his actual arrest, Lacour admitted that he had failed to complete a second change order for Broadway's house, and he stated that if the officers had found something wrong with the repairs to the house, "its my fault, nobody elses . . . I should've did my job right (sic)." See id. at ¶ 32.

On August 31, 2009, Lester and six other African American contractors and inspectors, including Lacour, were arrested. See id. at ¶ 34. That day, a press conference "featuring Caddo Parish Sheriff Steve Prator and Caddo Parish District Attorney Charles Scott" was held on the steps of the Caddo Parish courthouse. See id. at ¶ 35. At the press conference, Prator announced a $1.5 million scandal involving the arrestees to defraud the City of Shreveport, a statement that Lester alleges was made "falsely and with the full intention to mislead the public." See id. at ¶ 35. On November 18, 2009, Hall filed the first Bill of Information against Lester, charging him with Home Improvement Fraud and Filing or Maintaining False Public Records. See id. at ¶ 36.

On May 25, 2010, the trial of one of the other contractors, James Alex III ("Alex"), resulted in a mistrial. See id. at ¶ 37. According to Hall's statements to a reporter after the trial, the parties had made a joint motion for mistrial after they discovered that the jury instructions did not reflect the fact that Alex was charged with Home Improvement Fraud that allegedly occurred under an old statute and an amended statute. See id. at ¶ 37.

On July 8, 2010, Lester filed a Motion to Quash the Information in his case on the basis of statutory affirmative defenses to Home Improvement Fraud. See id. at ¶ 38. The trial judge held a hearing on the motion, but reserved a ruling until after trial. See id. at ¶ 39. On September 28, 2011, Lester provided the State with photographic evidence that allegedly proved that he was innocent of the Home Improvement Fraud charge. See id. at ¶ 40. On February 14, 2012, a second Bill of Information was filed against Lester which dropped the Home Improvement Fraud charge and included only the Filing or Maintaining False Public Records charge. See id. at ¶ 41.

On April 9, 2014, Lester filed a Motion to Quash the Amended Information, which the trial court granted. See id. at ¶ 42-43. On July 4, 2014, Sheriff Prator gave an interview to the editor of local newspaper The Inquisitor in which he stated that he was frustrated with the fact that Lester had not been prosecuted for Home Improvement Fraud and stating that Lester had committed theft and abuse of Broadway. See id. at ¶ 44. That same day, acting District Attorney Dale Cox ("Cox") sent an email to the editor of The Inquisitor stating why the Home Improvement Fraud charge against Lester was dropped and that the State would be appealing the trial court's decision to quash the Filing or Maintaining a False Public Record charge against Lester. See id. at ¶ 45. On May 20, 2015, the Louisiana Second Circuit Court of Appeal affirmed the trial court's decision to

quash the Filing or Maintating False Public Records charge against Lester on the basis of prescription. See id. at ¶ 51; see also Lester, 165 So.3d 1181 (La. App. 2 Cir. 05/20/16). Lester filed this suit against Hall, Scott, Cox, Turner, Long, May, and Caddo Parish on July 2, 2015. See Record Document 1.

## LAW AND ANALYSIS

I.   **Legal Standards.**

### A. Pleading Standards and the Rule 12(b)(6) Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) changed from the old, more plaintiff-friendly "no set of facts" standard to a "plausibility" standard found in Bell Atlantic v. Twombly and its progeny. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007). Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555-556, 127 S. Ct. at 1965. If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action," the pleading does not meet the standards of Rule 8(a)(2). Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citation omitted).

In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside the pleadings." Colle v. Brazos County, Texas, 981 F.2d 237, 243 (5th Cir. 1993). However, a court may also rely upon "documents incorporated into the complaint by reference and matters of which a court may take judicial notice" in deciding a motion to

dismiss. Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008). Additionally, Courts must also accept all allegations in a complaint as true. See Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. However, courts do not have to accept legal conclusions as facts. See id. Courts considering a motion to dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially plausible under the Iqbal and Twombly standard to survive such a motion. See id. at 678-679, 129 S. Ct. at 1949-1950. If the complaint does not meet this standard, it can be dismissed for failure to state a claim upon which relief can be granted. See id. Such a dismissal ends the case "at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558, 127 S. Ct. at 1966.

### B. Absolute Immunity and Qualified Immunity in § 1983 Actions

Section 1983 authorizes the assertion of a claim for relief against a person who, acting under the color of state law, allegedly violated the claimant's rights under federal law. See 42 U.S.C. § 1983. Section 1983 actions are often brought against persons acting under the color of state law in their individual capacity, but these persons are often protected from liability by absolute or qualified immunity. The concern with ending a case at a point of minimum expenditure of time and money is particularly acute when the defendant raises an immunity defense. See Rehberg v. Paulk, 132 S.Ct. 1497, 1503 (2012) (absolute immunity from civil liability allows the officials it protects the freedom to perform their duties "with independence and without fear of consequences"); see also Iqbal, 556 U.S. at 685, 129 S. Ct. at 1953 ("the basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery") (internal quotations and citations omitted). In fact, immunity defenses truly are

"an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (referring to qualified immunity).

Absolute immunity serves as a complete immunity from suit for officials in their individual capacities, and has been applied to legislators, judges, witnesses at trial, and prosecutors. See Rehberg, 132 S. Ct. at 1503. Under the "functional approach" the Supreme Court has outlined for determining whether a particular official is protected by absolute immunity, courts must look to "the nature of the function performed [by the official], not the identity of the actor who performed it." Kalina v. Fletcher, 522 U.S. 118, 127 (1997). Absolute immunity for prosecutors applies when prosecutors take actions in their role as advocates for the state by engaging in conduct that is "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 429-30 (1976). Absolute immunity protects prosecutors from suit for, among other actions, "initiating a prosecution." Id. at 431. However, when a prosecutor takes actions that are too attenuated from the judicial phase of the criminal process, he or she is only protected by qualified immunity. See Van de Kamp v. Goldstein, 555 U.S. 335, 342-43 (2009).

Like absolute immunity, qualified immunity only protects government officials from civil liability in their individual capacities. See Sanders-Burns v. City of Plano, 594 F.3d 366, 371 (5th Cir. 2010). Because of the important public policy behind the qualified immunity doctrine, a higher pleading standard applies in evaluating a plaintiff's complaint against a public official in his individual capacity once the official has raised a qualified immunity defense. See Schultea v. Wood, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (en banc); see also Floyd v. City of Kenner, 351 Fed. Appx. 890, 893-94 (5th Cir. 2009).

Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of demonstrating the inapplicability of qualified immunity. See Floyd, 351 Fed. Appx. at 893. First, the court must determine whether the plaintiff alleged sufficient facts to make out a violation of a constitutional right. See Pearson, 555 U.S. at 232. Second, the court must determine whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. Id. A defendant who can validly raise a qualified immunity defense will enjoy its protection so long as the allegedly violated constitutional right was not clearly established at the time of the violation. See id. In other words, the defendant can only be held liable if he violates a right that is clearly established at the time of the violation.

Additionally, when the plaintiff seeks to impose supervisory liability on a defendant public official in his individual capacity, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). Thus, a plaintiff must plead adequate facts establishing these elements under the heightened pleading standard applicable in qualified immunity cases to survive a Rule 12(b)(6) motion to dismiss.

### C. Section 1983/ Monell Claims against Local Governments

In addition to suits against persons acting under the color of state law in their individual capacities, Section 1983 also allows for suits against local government entities themselves. In Monell v. Dept. of Social Serv., 436 U.S. 658, 98 S. Ct. 2018 (1978), the Supreme Court held that municipalities and local government agencies cannot be held

liable for constitutional torts under Section 1983 under a theory of respondeat superior, id., 436 U.S. at 691, 98 S. Ct. at 2036, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id., 436 U.S. at 694, 98 S. Ct. at 2037-38. In other words, merely establishing a constitutional violation by an employee of a local government entity is not enough to impose liability upon that entity under Section 1983.

Rather, to succeed on a Monell claim against a local government entity, the plaintiff must establish (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. McGregory v. City of Jackson, 335 Fed. Appx. 446, 448, 2009 WL 1833958, *2 (5th Cir. 2009), citing Rivera v. Houston Indep. Sch. Dist., 349 F.3d 244, 247-49 (5th Cir. 2003). Locating an official "policy" or "custom" ensures that a local government entity will be held liable only for violations of constitutional rights that resulted from the decisions of those officials whose acts may fairly be said to be those of the government entity itself. Bryan Cty. Comm'rs v. Brown, 520 U.S. 397, 117 S. Ct. 1382 (1997).

An "official policy" may be established in one of three ways: (1) "when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," Id., 520 U.S. at 417, 117 S. Ct. 1382 (Souter, J., dissenting); (2) "where no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself," Id., 520 U.S. at 417-18, 117 S. Ct. 1382 (Souter, J., dissenting); and (3) "even

where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the need.'" Id. 520 U.S. at 419, 117 S. Ct. 1382 (Souter, J., dissenting) (quoting City of Canton v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205 (1989)).

### D. Absolute and Qualified Immunity under Louisiana Law

In Moresi v. State, the Supreme Court of Louisiana explained that though the Louisiana Constitution creates a private right of action against those who violate rights secured thereunder, those who act under color of state law in doing so are entitled to the protection of qualified immunity from liability for violations of the Louisiana Constitution. 567 So.2d 1081, 1091-95 (La. 09/06/1990). In so holding, the Court applied the same standard as federal law for deciding whether a person's actions are protected by qualified immunity. See id. at 1094. Later, in Knapper v. Connick, the Court adopted the federal rules for absolute immunity for prosecutors. 681 So.2d 944, 950 (La. 10/15/1996). The Court held that absolute immunity protected a prosecutor from liability in a civil suit for malicious prosecution when the prosecutor's actions all fell within the scope of the prosecutor's role as an advocate for the state. See id.

## II.   Analysis.

### A.  Lester's Claims against Hall

Hall was the prosecutor that issued the original Bill of Information against Lester on November 18, 2009, and he also prosecuted Alex for Home Improvement Fraud. See Record Document 1 at ¶¶ 36-37. Lester has filed a § 1983 cause of action against Hall

under the following theories: (1) "malicious prosecution and/or wrongful conviction[1];" (2) failing to "adequately to train and supervise and discipline its Assistant District Attorneys . . . to ensure that they review evidence to assure it is within the prescriptive period allowed by law;" (3) failing to adequately train, supervise and discipline its Assistant District Attorneys[2] to "ensure that they read and analyze the statute to be charged before filing a Bill of Information against a citizen and not just blindly go with what the Police investigator says the charge should be;" and (4) "failing to adequately train and supervise and discipline its Assistant District Attorneys . . . to ensure that a new or amended statute is not am (sic) ex post facto law as it is applied to a case when charging a citizen with a crime." See Record Document 1 at 15-19, ¶¶ 60, 63, 66. Additionally, Lester filed the following causes of action against Hall under state law: (1) intentional infliction of emotional distress; (2) negligent infliction of emotional distress; (3) and violations of La. Const. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24. See Record Document 1 at 25-27.

Lester bases these causes of action upon several specific factual allegations regarding Hall's actions in Lester's case and Alex's case. Lester alleges that Hall: (1) filed the original Bill of Information of November 18, 2009, against Lester; (2) prosecuted another defendant, Alex, in a Home Improvement Fraud case that ended in a mistrial; (3) made statements to the media regarding Alex's case indicating that Hall knew or should have known that he had made a mistake in charging Lester with the same offense; and

---

[1] As Lester was never convicted of a crime, he has no valid claim for wrongful conviction. Record Document 1 at ¶41; see also See Lester, 165 So.3d 1181 (La. App. 2 Cir. 05/20/16).

[2] In this allegation the Original Complaint actually stated "police officers" rather than Assistant District Attorneys, but it is clear from the content of the allegations in this section of the complaint that Lester was referring to Assistant District Attorneys rather than police officers. See Record Document 1 at ¶¶ 62-64.

(4) filed the second Bill of Information of February 14, 2012, against Lester, which dropped the Home Improvement Fraud charge.[3] See Record Document 1 at ¶¶ 36, 37, 41, 66. Hall filed this Motion to Dismiss on multiple grounds; Lester did not respond. See Record Document 15.

### i. Lester's Federal Claims against Hall Individually

Hall raised the defense of absolute immunity in his Motion to Dismiss for all of Lester's claims against him in his individual capacity. See Record Document 15-1. Taking all of Lester's factual allegations against Hall as true, all of Hall's actions are protected by absolute immunity. Initiating charges against Lester by filing a Bill of Information is certainly an action that is "so intimately associated with the judicial phase of the criminal process" that it qualifies for absolute immunity. Imbler, 424 U.S. at 429-30. Even if Hall made a mistake in charging Lester with Home Improvement Fraud or Filing False Public Records, such as by failing to consider the potential applicability of statutory affirmative defenses or prescription, absolute immunity protects Hall from personal liability for that action. See id. at 431 ("in initiating a prosecution . . . the prosecutor is immune from a civil suit for damages under § 1983"). Thus, all of Lester's § 1983 claims against Hall in his individual capacity must be dismissed.

---

[3] Later, Lester sought leave to amend his complaint three times, and the Court granted each request. See Record Documents 25, 27, 29, 32, 33, 40, 41, 42. The third amendment added a new paragraph, labeled "45N)," which stated that it was R. Bennet Langford rather than Hall that had filed this second Bill of Information against Lester. Record Documents 40, 42 at 4. Lester also attached the Bill of Information itself to the amended complaint, which affirmatively showed that it was Langford rather than Hall that filed the second Bill of Information. See Record Document 40-2 at 36.

### ii.    Lester's Federal Claims against Hall in His Official Capacity

A suit against a local official in his official capacity is actually a suit against the entity of which that official is an agent. See Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105 (1985). A local government entity can only be held liable for a constitutional violation under § 1983 when that violation can be attributed to the enforcement of a local government policy, practice, or decision of a final local government policy maker. See Monell, 436 U.S. at 694, 98 S. Ct. at 2037-38. Thus, the proper person to sue for a violation of a constitutional right by an employee of a Louisiana district attorney is the District Attorney in his official capacity, as the proper party in any § 1983 claim is the official or governmental body with final policymaking authority over the person who committed the violation. See Burge v. Parish of St. Tammany, 187 F.3d 452, 469 (5th Cir. 1999) (stating that "the entity liable for the torts of a district attorney's employees under state law is the office of the district attorney as an independent local government entity" because the District Attorney is a distinct, independent office created by the Louisiana Constitution with authority over a specific political subdivision). Lester states in his complaint that Hall is a "final policy maker responsible for his own actions and the actions of his subordinate employees." Record Document 1 ¶ 3. However, the Fifth Circuit has held that because Assistant District Attorneys are not final policy makers, they are not proper parties in § 1983 official capacity suits. See Truvia v. Julien, 187 Fed. Appx. 346, 350 (5th Cir. 2006).[4] Therefore, Lester's § 1983 claims against Hall in his official capacity must be dismissed.

---

[4] This opinion is unpublished, and is therefore not precedential. See 5th Cir. R. 47.5.4. However, the Court finds its rationale, which is based on the holding in Burge, 187 F.3d at 469, to be persuasive and applicable to the instant case.

### iii.     Lester's State Law Claims Against Hall

As stated above, Louisiana law is essentially identical to federal law regarding absolute prosecutorial immunity, so absolute immunity also protects Hall from suit under Lester's state constitutional claims. See Knapper, 681 So.2d at 950. Lester's other state law claims against Hall, IIED and NIED, are based upon the same factual allegations outlined above. Thus, because these allegations are "predicated on acts shielded by absolute immunity," they cannot form the basis of IIED or NIED claims under Louisiana law. Cousin v. Small, 2001 U.S. Dist. LEXIS 7903 at *27 (E.D. La. 2001). Such a conclusion serves the public policy purpose of allowing prosecutors to do their jobs without the concern that they might be held civilly liable for performing their duties. Thus, all state law claims against Hall must also be dismissed, and Hall's Rule 12(b)(6) Motion to Dismiss is therefore **GRANTED**.

### B.  Lester's Claims against Scott

Scott was the District Attorney at the time of Lester's initial arrest.[5] See Record Document 1 at ¶ 2. Lester filed the same causes of action against Scott as he filed against Hall. See Record Document 1 at ¶¶ 60, 63, 66, 88-102.

Lester bases these causes of action upon only two factual allegations regarding Scott's actions in Lester's case. Lester alleges that Scott: (1) was the District Attorney for Caddo Parish at the time Lester was arrested and first charged; and (2) was present at a press conference announcing the arrest of Lester and the other defendants who were later charged with Home Improvement Fraud. See Record Document 1 at ¶¶ 2, 35. Scott

---

[5] Scott passed away on April 22, 2015, and was replaced as acting District Attorney by First Assistant District Attorney Cox. See Record Document 20-1.

filed this Motion to Dismiss on multiple grounds; Lester did not respond. <u>See</u> Record Document 20.

### i.   Lester's Federal Claims against Scott Individually

As with Hall, absolute immunity protects Scott from civil liability in his individual capacity for acts that are "intimately associated with the judicial phase of the criminal process." <u>Imbler</u>, 242 U.S. at 429-30. Thus, Scott is absolutely immune from suit for any decisions made regarding whether to prosecute Lester. Though Lester does not directly assert in the complaint that Scott made this decision, it is clear that Scott was the District Attorney at the time Hall filed the original Bill of Information; thus, to the extent that the complaint alleges that Scott had any involvement in the decision to charge Lester, absolute immunity protects Scott from individual liability for any such actions. <u>See</u> Record Document 1 at 9-10.

Lester's second allegation regarding Scott relates to a press conference that was held on the steps of the Caddo Parish courthouse "featuring Caddo Parish Sheriff Steve Prator and Caddo Parish District Attorney Charles Scott." Record Document 1 at ¶ 35. Though Lester goes on to allege that Sheriff Prator made false statements about Scott at this press conference, he does not allege that Scott made any allegedly false statements about Lester; in fact, it is unclear from the complaint whether Scott spoke at this press conference at all. <u>See</u> Record Document 1 at ¶ 35. Statements by a prosecutor at a press conference would normally only be entitled to qualified immunity protection. <u>Buckley</u>, 509 U.S. at 277. However, because Lester failed to allege that Scott made any statements, that any such statements were false, or that any such statements were made with the requisite level of fault required under Louisiana law, Lester's allegations regarding Scott's

presence at the press conference cannot form the basis of any claim against Scott in his individual capacity. See Kennedy v. Sheriff of E. Baton Rouge, 935 So. 2d 669, 674 (La. 07/10/06) (outlining the elements of a defamation claim under Louisiana law); see also Cousin v. Small, 2001 U.S. Dist. LEXIS 7903 at *24-25 (E.D. La. 2001), citing San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697, 700-01 (5th Cir. 1991), (stating that a § 1983 plaintiff must show how an allegedly defamatory statement constituted both defamation and an infringement of some other interest to recover for defamation, since defamation is not a constitutional tort).

### ii.     Lester's Federal Claims against Scott in His Official Capacity

Lester's only claim that comes close to stating a Monell official capacity claim against the District Attorney is his claim that relates to a lack of training and supervision of Assistant District Attorneys in the areas of prescription, affirmative defenses available under criminal statutes (phrased as failing to "ensure that they read and analyze the statute to be charged" prior to filing charges in the complaint), and ex post facto laws. Record Document 1 at ¶¶ 60, 63, 66. Essentially, Lester argues that before the charges were filed against him, there was a failure to train and supervise in these areas, which led to the initial charges being filed. Additionally, after the mistrial of Alex in 2010, the District Attorney should have been on notice that a conviction of Lester or any of the other defendants for Home Improvement Fraud would be impossible. Thus, because the District Attorney was on notice of this fact by 2010 at the latest, he should have realized that more training and supervision of the Assistant District Attorneys was needed in these areas. This claim falls into the third category of alleging the type of "official policy" necessary for a Monell claim: that "the need to take some action to control the agents of the government

is so obvious, and the inadequacy of [existing practice] so likely to result in the violation of constitutional rights, that the policy maker . . . can reasonably be said to have been deliberately indifferent to the need." Bryan Cty. Comm'rs, 520 U.S. at 419, 117 S. Ct. 1382 (Souter, J., dissenting) (internal citations and quotations omitted).[6]

However, even assuming that there was a need for training and supervision in these areas prior to the filing of the initial charges or after the mistrial of Alex, this is not enough to impose liability on the District Attorney under § 1983. In Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350 (2012), the Supreme Court addressed dicta from a prior Supreme Court case, Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197 (1989), that had opened the door to potential "single-incident" liability for local governments in Monell claims. This dicta stated that a single constitutional violation by a state actor who has not been trained regarding the law in that particular area might justify a Monell claim, even without proof of a pre-existing pattern of violations to put the local government on notice of the need for training or supervision in that area. See Canton, 489 U.S. at 390 n.10, 109 S. Ct. 1197, 1206 n.10. Such liability would only be available when constitutional violations would be the "highly predictable consequence" of the failure to train in that particular area. Connick, 563 U.S. at 63-64. The specific scenario the Court in Canton envisioned was one in which a city failed to train its police officers on the constitutional

---

[6] Lester does not expressly make this argument in these exact terms in his complaint, but it is certainly implied in the complaint and is somewhat clarified in his Memorandum in Opposition to the Motion to Dismiss. See Record Documents 1, 39. The mistrial of Alex and the statements by Hall after the trial represent the only factual allegation that could have provided notice of deficient training or supervision to the District Attorney, so Lester's only arguable Monell claim would have to derive from the notice that that incident provided. Though pro se plaintiffs are not exempt from the application of procedural rules, the Court is required to construe his pro se pleadings somewhat more liberally than those drafted by a lawyer. See Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981).

requirements for the use of deadly force, particularly when attempting to arrest fleeing felons. See Canton, 489 U.S. at 390 n.10, 109 S. Ct. 1197, 1206 n.10.

In Connick, the Court rejected the application of that dicta to a case involving prosecutors. See Connick, 563 U.S. at 63-68. Connick involved a violation of the Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), requirement to disclose exculpatory evidence to a criminal defendant by prosecutors in Orleans Parish. See id. The Court held that "failure to train prosecutors in their Brady obligations does not fall within the narrow range of Canton's hypothesized single-incident liability." Id. at 64. First, because attorneys already undergo rigorous training in the law both during law school and once they enter practice, "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." Id. at 66. Second, the Court stated that the "nuance of the allegedly necessary training" was different in kind that the type of training the Court in Canton had envisioned. Id. at 67. Canton envisioned a complete lack of training for police officers on the issue of the use of deadly force; the situation in Connick involved a failure to train attorneys already familiar with the general requirements of Brady in the specific scenario related to the Brady violation in Connick. See id. Thus, because prosecutors are already familiar with the requirements of Brady through their training and experience, District Attorneys should not be deemed "deliberately indifferent" for failing to provide detailed training for every potential Brady situation that might arise. Id.

Though not in the context of Brady violations, Lester's arguments regarding the failure to train and supervise in the areas of prescription, statutory affirmative defenses, and ex post facto laws are similar to the argument the Court rejected in Connick. Lester's

argument based upon the initial charge in 2009 is nearly identical to the argument rejected in <u>Connick</u>: because the District Attorney failed to provide training and supervision in these areas, Lester was falsely charged with Home Improvement Fraud and Filing False Public Records. Because this is almost identical to the type of "single-incident" liability the Court in <u>Connick</u> rejected, this Court must reject it as well.

Lester's argument regarding the failure to train and supervise in these areas after the mistrial of Alex is slightly stronger, but the rationale of <u>Connick</u> requires the Court to reject that argument as well. Essentially, this argument is that because there was a mistrial in Alex's case in 2010 on the same charges and based on similar facts, the District Attorney should have been on notice that: (1) a conviction of Lester on both charges was impossible, and (2) there was a need for greater training of Assistant District Attorneys in the areas of prescription, statutory affirmative defenses, and ex post facto laws to prevent such false charges from being filed or maintained in the future. However, based upon the complaint and its attachments, it appears that the reason for the mistrial in 2010 was that the jury instructions did not reflect the fact that Alex was charged with Home Improvement Fraud that allegedly occurred under an old statute and an amended statute, resulting in a joint motion for mistrial. <u>See</u> Record Document 1 at ¶ 37.

Thus, the inferences regarding a need for training and supervision that the District Attorney could or should have taken from the single mistrial of one of Lester's co-defendants (the only incident alleged in the complaint that could have provided the District Attorney with notice of such a need) are murky at best. The required training and supervision that Lester alleges was necessary is the same type of nuanced, specific training that the Court in <u>Connick</u> stated District Attorneys are not required to provide.

See Connick, 563 U.S. at 67-68. The District Attorney's failure to provide this training, like the failure to provide specific Brady training in Connick, "simply cannot support an inference of deliberate indifference" necessary to state a Monell claim. Id. at 67. Therefore, Lester's claims against Scott in his official capacity must be dismissed.

### iii.    Lester's State Law Claims against Scott

As stated above, Louisiana law is essentially identical to federal law regarding absolute prosecutorial immunity, so absolute immunity also protects Scott from suit under Lester's state constitutional claims. See Knapper, 681 So.2d 944, 950. Lester's other state law claims against Scott, IIED and NIED, are based upon the same factual allegations outlined above. Thus, because these allegations are "predicated on acts shielded by absolute immunity," they cannot form the basis of IIED or NIED claims under Louisiana law. Cousin, 2001 U.S. Dist. LEXIS 7903 at *27. Such a conclusion serves the public policy purpose of allowing prosecutors to do their jobs without the concern that they might be held civilly liable for performing their duties. Finally, though never mentioned in the complaint as a specific cause of action against Scott, any defamation claim against Scott on the basis of his mere presence at the initial 2009 press conference is insufficient to state a defamation claim under state law. See Kennedy v. Sheriff of E. Baton Rouge, 935 So. 2d 669, 674 (La. 07/10/06) (outlining the elements of a defamation claim under Louisiana law). Thus, all state law claims against Scott must also be dismissed, and Scott's Rule 12(b)(6) Motion to Dismiss is therefore **GRANTED**.

### CONCLUSION

The Court finds that dismissal of all of Lester's claims against Hall and Scott under Rule 12(b)(6) is appropriate. Hall and Scott's Rule 12(b)(6) motions are therefore

**GRANTED**, and any and all claims asserted against Hall and Scott are hereby **DISMISSED WITH PREJUDICE**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this the 29th day of September, 2016.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE