UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JAMES HAYWARD LESTER                    CIVIL ACTION NO. 15-2008

VERSUS                                  JUDGE S. MAURICE HICKS, JR.

CADDO PARISH, ET AL.                    MAGISTRATE JUDGE HORNSBY

### MEMORANDUM RULING

Before the Court is Defendant Dale Cox's ("Cox") Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) (Record Document 19) regarding Plaintiff James Hayward Lester's ("Lester") allegations in his Complaint (Record Document 1) alleging federal constitutional violations under 42 U.S.C. § 1983, Louisiana constitutional violations, and state tort claims against Defendants. For the reasons which follow, Cox's 12(b)(6) Motion to Dismiss is **GRANTED IN PART** and **DENIED IN PART**.

### FACTUAL AND PROCEDURAL BACKGROUND

Lester is a resident of Tarrant County, Texas, but for many years has been active as a commercial contractor in Shreveport. See Record Document 1 at 1-4. On February 28, 2003, Lester first filed his application for a Louisiana commercial contractor's license in Shreveport. See id. at ¶ 13. This application included a statement that Lester had never been convicted of a felony or misdemeanor; in fact, Lester had previously been convicted of a misdemeanor in Texas. See id. at ¶ 25; see also State v. Lester, 165 So.3d 1181 (La. App. 2 Cir. 05/20/16). Lester received a valid commercial contractor license on May 15, 2003. See Record Document 1 at ¶ 14. He continually reapplied for such a license and held a valid license during all times relevant to this case. See id. at ¶ 15.

Part of Lester's contracting work involved making repairs to houses of people who applied for grants from the City of Shreveport's Bureau of Housing and Business Development. See id. at ¶ 16-17. Lester would submit a bid for the requested work and, if he had the lowest bid, he would receive the contract to perform the work. See id. In October 2007, Lester was awarded the contract to perform work on Ms. Bessie Lee Broadway's ("Broadway") home. See id. On January 14, 2008, a change order for the original contract was approved, allowing Lester to receive an additional fee of $5,100 for additional work. See id. at ¶ 21. On January 24, 2008, Lester, Broadway, and City Inspector Daniel Lacour ("Lacour") executed a "Contractor's Pay-Out Request" to pay Lester $17,900 for work that Lester had completed. See id. at ¶ 20.

On March 8, 2008, Lacour and Lester orally agreed to a second change order which would allow Lester to repair and service the furnace in the home rather than replace it entirely and use the money that would have paid for a new furnace to replace a deteriorated wall. See id. at ¶ 22. Lacour later admitted that he forgot to complete a physical change order for these changes. See id. On April 1, 2008, Lester, Broadway, and Lacour executed a second "Contractor's Pay-Out Request" to pay Lester $7,090 for the remainder of the work that Lester had completed. See id. at ¶ 23.

On March 19, 2009, Sergeant Jason Turner ("Turner") of the Louisiana State Police and Sergeant Jay Long ("Long") and Corporal John May ("May") of the Caddo Parish Sheriff's Department began an investigation into Lester's activities as a contractor. See id. at ¶ 24. During the investigation, Turner found Lester's previous misdemeanor conviction and received documents related to the repairs Lester completed on Broadway's house. See id. at ¶¶ 24-27. On July 15, 2009, Turner obtained a warrant for

Lester's arrest for Filing or Maintaining False Public Records by submitting renewal applications for his contractor's license without correcting the statement that he had not been convicted of a previous misdemeanor. See id. at ¶ 28.

Turner, Long, and May continued their investigation of Lester by inspecting Broadway's property with another inspector, Timothy Weaver ("Weaver"). See id. at ¶ 29. Weaver later sent a letter to Turner stating that he found that Lester had failed to install as much insulation in Broadway's attic as the contract had called for. See id. at ¶ at 30. On August 29, Turner obtained an arrest warrant for Lester and Lacour's arrest for Home Improvement Fraud. See id. at ¶ 31. In interviews with the officers after the arrest warrants were issued but prior to his actual arrest, Lacour admitted that he had failed to complete a second change order for Broadway's house, and he stated that if the officers had found something wrong with the repairs to the house, "its my fault, nobody elses . . . I should've did my job right (sic)." See id. at ¶ 32.

On August 31, 2009, Lester and six other African American contractors and inspectors, including Lacour, were arrested. See id. at ¶ 34. That day, a press conference "featuring Caddo Parish Sheriff Steve Prator and Caddo Parish District Attorney Charles Scott" was held on the steps of the Caddo Parish courthouse. See id. at ¶ 35. At the press conference, Prator announced a $1.5 million scandal involving the arrestees to defraud the City of Shreveport, a statement that Lester alleges was made "falsely and with the full intention to mislead the public." See id. at ¶ 35. On November 18, 2009, Hall filed the first Bill of Information against Lester, charging him with Home Improvement Fraud and Filing or Maintaining False Public Records. See id. at ¶ 36.

On May 25, 2010, the trial of one of the other contractors, James Alex III ("Alex"), resulted in a mistrial. See id. at ¶ 37. According to Hall's statements to a reporter after the trial, the parties had made a joint motion for mistrial after they discovered that the jury instructions did not reflect the fact that Alex was charged with Home Improvement Fraud that allegedly occurred under an old statute and an amended statute. See id. at ¶ 37. On July 8, 2010, Lester filed a Motion to Quash the Information in his case on the basis of statutory affirmative defenses to Home Improvement Fraud. See id. at ¶ 38. The trial judge held a hearing on the motion, but reserved a ruling until after trial. See id. at ¶ 39. On September 28, 2011, Lester provided the State with photographic evidence that allegedly proved that he was innocent of the Home Improvement Fraud charge. See id. at ¶ 40. On February 14, 2012, a second Bill of Information was filed against Lester which dropped the Home Improvement Fraud charge and included only the Filing or Maintaining False Public Records charge. See id. at ¶ 41.

On April 9, 2014, Lester filed a Motion to Quash the Amended Information, which the trial court granted. See id. at ¶ 42-43. On July 4, 2014, Sheriff Prator gave an interview to the editor of local newspaper The Inquisitor in which he stated that he was frustrated with the fact that Lester had not been prosecuted for Home Improvement Fraud and stating that Lester had committed theft and abuse of Broadway. See id. at ¶ 44. That same day, acting District Attorney Dale Cox[1] ("Cox") sent an email to the editor of The Inquisitor stating why the Home Improvement Fraud charge against Lester was dropped and that the State would be appealing the trial court's decision to quash the Filing or

---

[1] Former co-defendant Charles R. Scott passed away on April 22, 2015, and First Assistant District Attorney Cox replaced Scott as acting District Attorney. See Record Document 20-1.

Maintaining a False Public Record charge against Lester.[2] See id. at ¶ 45. On May 20, 2015, the Louisiana Second Circuit Court of Appeal affirmed the trial court's decision to quash the Filing or Maintaining False Public Records charge against Lester on the basis of prescription. See id. at ¶ 51; see also Lester, 165 So.3d 1181 (La. App. 2 Cir. 05/20/16). Lester filed this suit against Hall, Scott, Cox, Turner, Long, May, and Caddo Parish on July 2, 2015. See Record Document 1.

## LAW AND ANALYSIS

### I.    Legal Standards.

### A. Pleading Standards and the Rule 12(b)(6) Standard

Rule 8(a)(2) of the Federal Rules of Civil Procedure governs the requirements for pleadings that state a claim for relief, requiring that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The standard for the adequacy of complaints under Rule 8(a)(2) changed from the old, more plaintiff-friendly "no set of facts" standard to a "plausibility" standard found in Bell Atlantic v. Twombly and its progeny. Twombly, 550 U.S. 544, 127 S. Ct. 1955 (2007). Under this standard, "factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555-556, 127 S. Ct. at 1965. If a pleading only contains "labels and conclusions" and "a formulaic recitation of the elements of a cause of action," the pleading

---

[2] Lester's third amended complaint contains the article from *The Inquisitor* in which both Prator and Cox are quoted. See Record Document 40-2 at 2. As the attached article is now a part of the complaint and can be considered in a 12(b)(6) motion, the Court assumes for the purposes of the instant Motion that the quotes from the article accurately reflect the actual statements of Prator and Cox, as it must at the 12(b)(6) stage. See Dorsey v. Portfolio Equities, Inc., 540 F.3d 333, 338 (5th Cir. 2008).

does not meet the standards of Rule 8(a)(2). Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.
Ct. 1937, 1949 (2009) (citation omitted).

In deciding a Rule 12(b)(6) motion to dismiss, a court generally "may not go outside
the pleadings." Colle v. Brazos County, Texas, 981 F.2d 237, 243 (5th Cir. 1993).
However, a court may also rely upon "documents incorporated into the complaint by
reference and matters of which a court may take judicial notice" in deciding a motion to
dismiss. Dorsey, 540 F.3d at 338. Additionally, Courts must also accept all allegations in
a complaint as true. See Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. However, courts do
not have to accept legal conclusions as facts. See id. Courts considering a motion to
dismiss under Rule 12(b)(6) are only obligated to allow those complaints that are facially
plausible under the Iqbal and Twombly standard to survive such a motion. See id. at 678-
679, 129 S. Ct. at 1949-1950. If the complaint does not meet this standard, it can be
dismissed for failure to state a claim upon which relief can be granted. See id. Such a
dismissal ends the case "at the point of minimum expenditure of time and money by the
parties and the court." Twombly, 550 U.S. at 558, 127 S. Ct. at 1966.

### B. Absolute Immunity and Qualified Immunity in § 1983 Actions

Section 1983 authorizes the assertion of a claim for relief against a person who,
acting under the color of state law, allegedly violated the claimant's rights under federal
law. See 42 U.S.C. § 1983. Section 1983 actions are often brought against persons acting
under the color of state law in their individual capacity, but these persons are often
protected from liability by absolute or qualified immunity. The concern with ending a case
at a point of minimum expenditure of time and money is particularly acute when the
defendant raises an immunity defense. See Rehberg v. Paulk, 132 S.Ct. 1497, 1503

(2012) (absolute immunity from civil liability allows the officials it protects the freedom to perform their duties "with independence and without fear of consequences"); see also Iqbal, 556 U.S. at 685, 129 S. Ct. at 1953 ("the basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including avoidance of disruptive discovery") (internal quotations and citations omitted). In fact, immunity defenses truly are "an immunity from suit rather than a mere defense to liability." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (referring to qualified immunity).

Absolute immunity serves as a complete immunity from suit for officials in their individual capacities, and has been applied to legislators, judges, witnesses at trial, and prosecutors. See Rehberg, 132 S. Ct. at 1503. Under the "functional approach" the Supreme Court has outlined for determining whether a particular official is protected by absolute immunity, courts must look to "the nature of the function performed [by the official], not the identity of the actor who performed it." Kalina v. Fletcher, 522 U.S. 118, 127 (1997). Absolute immunity for prosecutors applies when prosecutors take actions in their role as advocates for the state by engaging in conduct that is "intimately associated with the judicial phase of the criminal process." Imbler v. Pachtman, 424 U.S. 409, 429-30 (1976). Absolute immunity protects prosecutors from suit for, among other actions, "initiating a prosecution." Id. at 431. However, when a prosecutor takes actions that are too attenuated from the judicial phase of the criminal process, he or she is only protected by qualified immunity. See Van de Kamp v. Goldstein, 555 U.S. 335, 342-43 (2009).

Like absolute immunity, qualified immunity only protects government officials from civil liability in their individual capacities. See Sanders-Burns v. City of Plano, 594 F.3d 366, 371 (5th Cir. 2010). Because of the important public policy behind the qualified

immunity doctrine, a higher pleading standard applies in evaluating a plaintiff's complaint against a public official in his individual capacity once the official has raised a qualified immunity defense. See Schultea v. Wood, 47 F.3d 1427, 1433-34 (5th Cir. 1995) (*en banc*); see also Floyd v. City of Kenner, 351 Fed. Appx. 890, 893-94 (5th Cir. 2009).

Once the defendant raises a qualified immunity defense, the plaintiff carries the burden of demonstrating the inapplicability of qualified immunity. See Floyd, 351 Fed. Appx. at 893. First, the court must determine whether the plaintiff alleged sufficient facts to make out a violation of a constitutional right. See Pearson, 555 U.S. at 232. Second, the court must determine whether the constitutional right at issue was "clearly established" at the time of the defendant's alleged misconduct. Id. A defendant who can validly raise a qualified immunity defense will enjoy its protection so long as the allegedly violated constitutional right was not clearly established at the time of the violation. See id. In other words, the defendant can only be held liable if he violates a right that is clearly established at the time of the violation.

Additionally, when the plaintiff seeks to impose supervisory liability on a defendant public official in his individual capacity, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Estate of Davis v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir. 2005). Thus, a plaintiff must plead adequate facts establishing these elements under the heightened pleading standard applicable in qualified immunity cases to survive a Rule 12(b)(6) motion to dismiss.

**C. Section 1983/ <u>Monell</u> Claims against Local Governments**

In addition to suits against persons acting under the color of state law in their individual capacities, Section 1983 also allows for suits against local government entities themselves. In <u>Monell v. Dept. of Social Serv.</u>, 436 U.S. 658, 98 S. Ct. 2018 (1978), the Supreme Court held that municipalities and local government agencies cannot be held liable for constitutional torts under Section 1983 under a theory of respondeat superior, <u>id.</u>, 436 U.S. at 691, 98 S. Ct. at 2036, but they can be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." <u>Id.</u>, 436 U.S. at 694, 98 S. Ct. at 2037-38. In other words, merely establishing a constitutional violation by an employee of a local government entity is not enough to impose liability upon that entity under Section 1983.

Rather, to succeed on a <u>Monell</u> claim against a local government entity, the plaintiff must establish (1) an official policy or custom, of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose "moving force" is that policy or custom. <u>McGregory v. City of Jackson</u>, 335 Fed. Appx. 446, 448, 2009 WL 1833958, *2 (5th Cir. 2009), *citing* <u>Rivera v. Houston Indep. Sch. Dist.</u>, 349 F.3d 244, 247-49 (5th Cir. 2003). Locating an official "policy" or "custom" ensures that a local government entity will be held liable only for violations of constitutional rights that resulted from the decisions of those officials whose acts may fairly be said to be those of the government entity itself. <u>Bryan Cty. Comm'rs v. Brown</u>, 520 U.S. 397, 117 S. Ct. 1382 (1997).

An "official policy" may be established in one of three ways: (1) "when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy," Id., 520 U.S. at 417, 117 S. Ct. 1382 (Souter, J., dissenting); (2) "where no rule has been announced as 'policy' but federal law has been violated by an act of the policymaker itself," Id., 520 U.S. at 417-18, 117 S. Ct. 1382 (Souter, J., dissenting); and (3) "even where the policymaker has failed to act affirmatively at all, so long as the need to take some action to control the agents of the government 'is so obvious, and the inadequacy [of existing practice] so likely to result in the violation of constitutional rights, that the policymaker . . . can reasonably be said to have been deliberately indifferent to the need.'" Id. 520 U.S. at 419, 117 S. Ct. 1382 (Souter, J., dissenting) (quoting City of Canton v. Harris, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205 (1989)).

### E. Absolute and Qualified Immunity under Louisiana Law

In Moresi v. State, the Supreme Court of Louisiana explained that though the Louisiana Constitution creates a private right of action against those who violate rights secured thereunder, those who act under color of state law in doing so are entitled to the protection of qualified immunity from liability for violations of the Louisiana Constitution. 567 So.2d 1081, 1091-95 (La. 09/06/1990). In so holding, the Court applied the same standard as federal law for deciding whether a person's actions are protected by qualified immunity. See id. at 1094. Later, in Knapper v. Connick, the Court adopted the federal rules for absolute immunity for prosecutors. 681 So.2d 944, 950 (La. 10/15/1996). The Court held that absolute immunity protected a prosecutor from liability in a civil suit for

malicious prosecution when the prosecutor's actions all fell within the scope of the prosecutor's role as an advocate for the state. See id.

## II.    Analysis.

### A.  Lester's Claims against Cox

According to the complaint, Cox was involved with prosecuting Lester from the time of Lester's arrest, and served as the District Attorney for Caddo Parish during part of the period of time relevant to this case. See Record Document 1 at ¶ 3; see also Record Document 40 at ¶ 4. Lester has filed a § 1983 cause of action against Cox under the following theories: (1) "malicious prosecution and/or wrongful conviction;" (2) failing to "adequately . . . train and supervise and discipline [his] Assistant District Attorneys . . . to ensure that they review evidence to assure it is within the prescriptive period allowed by law;" (3) failing to adequately train, supervise and discipline his Assistant District Attorneys[3] to "ensure that they read and analyze the statute to be charged before filing a Bill of Information against a citizen and not just blindly go with what the Police investigator says the charge should be;" and (4) failing to adequately train and supervise and discipline his Assistant District Attorneys "to ensure that a new or amended statute is not am (sic) ex post facto law as it is applied to a case when charging a citizen with a crime." See Record Document 1 at 15-19, ¶¶ 60, 63, 66. Additionally, Lester filed the following causes of action against Cox under state law: (1) intentional infliction of emotional distress; (2) libel; (3) negligent infliction of emotional distress; (4) and violations of La. Const. Art. I, §§ 2, 3, 5, 12, 13, 15, 16, 20, 22, and 24. See Record Document 1 at 25-27.

---

[3] In this allegation the Original Complaint actually stated "police officers" rather than Assistant District Attorneys, but it is clear from the content of the allegations in this section of the complaint that Lester was referring to Assistant District Attorneys rather than police officers. See Record Document 1 at ¶¶ 62-64.

Lester bases these causes of action upon several specific factual allegations regarding Cox's actions in Lester's case. Lester alleges that Cox: (1) worked "hand in hand" with law enforcement in the investigation of Lester; (2) "did not give legal advice to [law enforcement] . . . but . . . himself, came up with the charges" filed against Lester; (3) supervised the entirety of the case against Lester from the beginning, including the filing of the Bills of Information against Lester; (4) sent an email to a local newspaper in which he explained the actions of the district attorney's office in the case against Lester; and (5) filed a Motion to Appeal the trial court's decision to quash the Filing False Public Records charge against Lester. See Record Document 1 at ¶¶ 3, 45, 46, 63, 86; Record Document 40 at 1-5. Cox filed this Motion to Dismiss on multiple grounds; Lester opposed the Motion. See Record Documents 19, 39.

### i. Lester's Federal Claims against Cox Individually

Absolute immunity protects Cox from civil liability in his individual capacity for acts that are "intimately associated with the judicial phase of the criminal process." Imbler, 242 U.S. at 429-30. Thus, Cox is absolutely immune from suit for any decisions made regarding whether to prosecute Lester. See id. at 431. This means that Cox's actions in coming up with the charges against Lester, supervising the prosecution of Lester, and pursuing an appeal in Lester's case (listed as factual allegations 2, 3, and 5 in the previous paragraph) all fall under the protection of absolute immunity and cannot form the basis of § 1983 claims against Cox in his individual capacity.

As noted, Lester claims that Cox worked "hand in hand" with law enforcement in investigating Lester but did not give legal advice regarding what charges should be filed during the investigation itself. Record Document 40 at ¶ 4. A prosecutor's actions in

engaging in investigative activity prior to the establishment of probable cause are only protected by qualified immunity. See Buckley, 509 U.S. at 277-78.

Here, however the allegation of working "hand in hand" with law enforcement during the investigation is so vague and conclusory that it cannot form the basis of a claim against Cox. Lester purports to add more factual allegations against Cox in his third amended complaint. See Record Document 40. However, a review of the added allegations as well as the seventeen exhibits Lester attached to his third amended complaint fails to reveal any more specific details regarding Cox's involvement in the original investigation. See Record Documents 40, 40-2. Cox is only mentioned in the first exhibit, where an email from him is quoted in a local newspaper article regarding actions taken in Lester's case long after the initial investigation. See Record Document 40-2 at 1-36. The added allegations in the third amended complaint itself merely refer to the exhibits and what they purportedly say about Cox. See Record Document 40. Therefore, even though Cox's actions during the initial investigation would only be entitled to qualified immunity and would necessitate a qualified immunity analysis, Lester failed to allege enough facts regarding these actions upon which a claim can be made.

However, Lester's allegations related to the email Cox sent to the local newspaper editor may state a defamation claim under § 1983.[4] Defamation is not in itself a constitutional tort, Kerr v. Lyford, 171 F.3d 330, 339 (5th Cir. 1999), and "there is no

_____

[4] It is not entirely clear from the complaint that Lester sought to use Cox's emailed statements as the basis for a defamation claim under § 1983, as Lester first refers to a form of defamation when he labels one of his claims "Claim for Intentional Infliction of Emotional Distress Under Louisiana Law Against [Cox] for Libel." Record Document 1 at 25. However, in keeping with the requirement that the Court be somewhat liberal in its interpretation of *pro se* pleadings, the Court will treat this as Lester's attempt to allege a § 1983 claim for defamation as well as state tort claims for IIED and defamation. See Birl v. Estelle, 660 F.2d 592, 593 (5th Cir. 1981).

constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." San Jacinto Sav. & Loan v. Kacal, 928 F.2d 697, 700-01 (5th Cir. 1991). "Section 1983 does, however, protect against the deprivation of a property interest whenever the State seeks to remove or significantly alter the status of liberty or property interests recognized by state law" or by one of the provisions of the Bill of Rights that have been incorporated into the Fourteenth Amendment's due process clause. Id. at 701.

This means that a defamation allegation can form the basis of a § 1983 claim only when the claimant alleges both that (1) stigma and (2) an infringement of some other interest protected under state or federal law resulted from the alleged defamation. See id. The Fifth Circuit "has found sufficient 'stigma' only in concrete, false factual representations or assertions, by a state actor, of wrongdoing on the part of the claimant." Id.  A claimant can only adequately allege the "infringement" of some other right by alleging that "the state sought to remove or significantly alter a life, liberty, or property interest recognized and protected by state law or guaranteed by one of the provisions of the Bill of Rights that has been incorporated." Id. at 701-02.

Here, at this early stage of the litigation, Lester has sufficiently alleged that Cox's emailed statements constitute defamation and that the allegedly defamatory statements caused the deprivation of a protected right. Assuming that the newspaper article's quotes of Cox's emailed statements are correct, Cox's email stated that the district attorney's office decided to drop the Home Improvement Fraud charge against Lester because the evidence showed that Lester "had done a significant amount of work on the houses in question, in many cases as much as 65 percent to 80 percent of the required work . . .

we could not use the fact that Mr. Lester may have done shoddy work or incomplete work to meet our burden of legal proof." Record Document 40-2 at 2. Regarding the filing false public records charge, Cox is quoted as writing "the gravamen of this offense was Mr. Lester's false statement on his application (for a contractor's license) that he had not been previously convicted when, in fact, he had been previously convicted of a misdemeanor offense." Id.

Lester argues that these emailed statements (1) were libelous because they insulted Lester's performance of his job as a contractor[5] and (2) establish that Cox engaged in malicious prosecution of Lester by failing to drop the charges against him earlier. See Record Document 39 at 12-14. Cox argues that the statements were not libelous as a matter of law, and Cox raised the defense of absolute immunity regarding the decision to prosecute Lester. See Record Document 19-1 at 7-8.

Lester's second argument regarding these statements can be easily dispensed with. Lester infers from Cox's statement that Cox knew for many months that the Home Improvement Fraud charge could not go forward, and that Cox thereby engaged in malicious prosecution by maintaining that charge. See Record Document 39 at 12. Even assuming Cox did know that the Home Improvement Fraud charge would be unsuccessful

---

[5] Lester makes no argument that Cox's statement regarding Lester's allegedly false statement on the application for the contractor's license constituted libel, but instead focuses his arguments on Cox's statement regarding Lester's work performance. See Record Document 39 at 12-14. In any event, it appears that Cox's statements regarding Lester's false statement on his original contractor application were true, and therefore cannot as a matter of law form the basis of a defamation cause of action. See State v. Lester, 165 So.3d 1181, 1183 (La. App. 2 Cir. 05/20/16) (stating that Lester's answer to the question about previous convictions "was indeed inaccurate" because he had previously been convicted of a misdemeanor in Texas); see also Record Document 1 ¶ 25 (in which Lester admits he has a prior Texas misdemeanor conviction). Therefore, the Court will only address Cox's statement regarding Lester's performance of the contract work.

months before the charge was dropped, absolute immunity protects Cox from liability for failing to drop the charge earlier, as this decision is one that is "intimately associated with the judicial phase of the criminal process." Imbler, 242 U.S. at 429-30.

The statement regarding Lester's performance as a contractor, however, can form the basis of a defamation action under § 1983. "Four elements are necessary to establish a claim for defamation: (1) a false and defamatory statement concerning another; (2) an unprivileged publication to a third party; (3) fault (negligence or greater) on the part of the publisher; and (4) resulting injury." Kennedy v. Sheriff of E. Baton Rouge, 935 So. 2d 669, 674 (La. 07/10/06). Cox stated that Lester had performed only 65 to 85 percent of the contracted work and that this may have been shoddy or incomplete work. See Record Document 40-2 at 2. This constitutes an assertion of fact by Cox. Lester alleges that Cox's characterization of his work is false, and that the publication of that allegedly false statement caused damage to his reputation, loss of professional opportunity, loss of income, humiliation, indignities, and embarrassment. See Record Document 1 at ¶¶ 87, 113. Thus, he has sufficiently alleged a "stigma" resulting from the allegedly false statements Cox made. San Jacinto Sav. & Loan, 928 F.2d 697 at 700-01. This allegation is also enough to constitute an "infringement" because "the liberty to operate a legitimate business, free from arbitrary deprivation" of that right by a state actor falls under the protection of the Fourteenth Amendment's due process clause. Id. at 702.

In his Motion to Dismiss, Cox argues that the emailed statements cannot constitute defamation because they are not defamatory as a matter of law. See Record Document 19-1 at 7-8. He argues that defamatory words are only those that are either (1) defamatory per se or (2) objectively susceptible of a defamatory meaning. See id. at 8. Because Cox

stated that Lester "*may* have done shoddy work or incomplete work," Cox argues that his words cannot constitute defamation. Id. (emphasis added).

The Court disagrees. Statements that impugn a person's professional reputation are defamatory *per se*. See Kennedy, 935 So. 2d 669 at 674. Thus, because these words related to Lester's business practices, and taking it as true that the statement was false, the statement was defamatory *per se*. Second, the emailed statement using the term "may" has multiple reasonable interpretations, not just the non-defamatory interpretation Cox advances. Though Cox's interpretation of the words is reasonable, Lester's argument that those words should be interpreted as impugning his professional reputation or business practices is also reasonable. One could reasonably interpret Cox's words as stating that Lester's work *was* shoddy and incomplete, constituting only 65 to 80 percent of the contracted work, but that this shoddy and incomplete work was an insufficient basis upon which to convict him of Home Improvement Fraud. Thus, accepting as true Lester's allegation that the statement was false as the Court must at this stage of the litigation, the Court rejects Cox's argument that his words cannot be defamatory as a matter of law.

Finally, prosecutors' statements to the media do not qualify for absolute immunity. See Buckley, 509 U.S. at 277-78 (holding that a prosecutor's statements at a press conference were not protected by absolute immunity). Instead, only qualified immunity protects prosecutors from civil liability when they engage in such actions. See id. In Cox's motion, he recognizes that actions that are investigative or administrative in nature are not protected by absolute immunity, but he does not argue that the defamation claim is barred by qualified immunity. See Record Document 19-1 at 5-6. Thus, the Court will not address whether qualified immunity applies at this stage of the litigation.

Therefore, the allegations in Lester's complaint do form a sufficient basis for his defamation claim under § 1983 to survive Rule 12(b)(6) scrutiny. While Cox is free to raise other common defamation defenses such as the truth of the statement, the lack of the requisite level of fault in making the statement, or qualified immunity at the summary judgment stage, his Rule 12(b)(6) motion must be denied. The state law defamation claim is addressed below. See Section II, A, iii, *infra*.

### ii. Lester's Federal Claims against Cox in His Official Capacity

Lester's only claim that comes close to stating a Monell official capacity claim against the District Attorney is his claim that relates to a lack of training and supervision of Assistant District Attorneys in the areas of prescription, affirmative defenses available under criminal statutes (phrased as failing to "ensure that they read and analyze the statute to be charged" prior to filing charges in the complaint), and ex post facto laws. Record Document 1 at ¶¶ 60, 63, 66. Essentially, Lester argues that before the charges were filed against him, there was a failure to train and supervise in these areas, which led to the initial charges being filed. Additionally, after the mistrial of Alex in 2010, the District Attorney should have been on notice that a conviction of Lester or any of the other defendants for Home Improvement Fraud would be impossible. Thus, because the District Attorney was on notice of this fact by 2010 at the latest, he should have realized that more training and supervision of the Assistant District Attorneys was needed in these areas. This claim falls into the third category of alleging the type of "official policy" necessary for a Monell claim: that "the need to take some action to control the agents of the government is so obvious, and the inadequacy of [existing practice] so likely to result in the violation of constitutional rights, that the policy maker . . . can reasonably be said to have been

deliberately indifferent to the need." Bryan Cty. Comm'rs, 520 U.S. at 419, 117 S. Ct. 1382 (Souter, J., dissenting) (internal citations and quotations omitted).[6]

However, even assuming that there was a need for training and supervision in these areas prior to the filing of the initial charges or after the mistrial of Alex, this is not enough to impose liability on the District Attorney under § 1983. In Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350 (2012), the Supreme Court addressed dicta from a prior Supreme Court case, Canton v. Harris, 489 U.S. 378, 109 S. Ct. 1197 (1989), that had opened the door to potential "single-incident" liability for local governments in Monell claims. This dicta stated that a single constitutional violation by a state actor who has not been trained regarding the law in that particular area might justify a Monell claim, even without proof of a pre-existing pattern of violations to put the local government on notice of the need for training or supervision in that area. See Canton, 489 U.S. at 390 n.10, 109 S. Ct. 1197, 1206 n.10. Such liability would only be available when constitutional violations would be the "highly predictable consequence" of the failure to train in that particular area. Connick, 563 U.S. at 63-64. The specific scenario the Court in Canton envisioned was one in which a city failed to train its police officers on the constitutional requirements for the use of deadly force, particularly when attempting to arrest fleeing felons. See Canton, 489 U.S. at 390 n.10, 109 S. Ct. 1197, 1206 n.10.

---

[6] Lester does not expressly make this argument in these exact terms in his complaint, but it is certainly implied in the complaint and is somewhat clarified in his Memorandum in Opposition to the Motion to Dismiss. See Record Documents 1, 39. The mistrial of Alex and the statements by Hall after the trial represent the only factual allegation that could have provided notice of deficient training or supervision to the District Attorney, so Lester's only arguable Monell claim would have to derive from the notice that that incident provided. Though pro se plaintiffs are not exempt from the application of procedural rules, the Court is required to construe his pro se pleadings somewhat more liberally than those drafted by a lawyer. See Birl, 660 F.2d at 593 (5th Cir. 1981).

In Connick, the Court rejected the application of that dicta to a case involving prosecutors. See Connick, 563 U.S. at 63-68. Connick involved a violation of the Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), requirement to disclose exculpatory evidence to a criminal defendant by prosecutors in Orleans Parish. See id. The Court held that "failure to train prosecutors in their Brady obligations does not fall within the narrow range of Canton's hypothesized single-incident liability." Id. at 64. First, because attorneys already undergo rigorous training in the law both during law school and once they enter practice, "recurring constitutional violations are not the 'obvious consequence' of failing to provide prosecutors with formal in-house training about how to obey the law." Id. at 66. Second, the Court stated that the "nuance of the allegedly necessary training" was different in kind that the type of training the Court in Canton had envisioned. Id. at 67. Canton envisioned a complete lack of training for police officers on the issue of the use of deadly force; the situation in Connick involved a failure to train attorneys already familiar with the general requirements of Brady in the specific scenario related to the Brady violation in Connick. See id. Thus, because prosecutors are already familiar with the requirements of Brady through their training and experience, District Attorneys should not be deemed "deliberately indifferent" for failing to provide detailed training for every potential Brady situation that might arise. Id.

Though not in the context of Brady violations, Lester's arguments regarding the failure to train and supervise in the areas of prescription, statutory affirmative defenses, and ex post facto laws are similar to the argument the Court rejected in Connick. Lester's argument based upon the initial charge in 2009 is nearly identical to the argument rejected in Connick: because the District Attorney failed to provide training and supervision in

these areas, Lester was falsely charged with Home Improvement Fraud and Filing False Public Records. Because this is almost identical to the type of "single-incident" liability the Court in <u>Connick</u> rejected, this Court must reject it as well.

Lester's argument regarding the failure to train and supervise in these areas after the mistrial of Alex is slightly stronger, but the rationale of <u>Connick</u> requires the Court to reject that argument as well. Essentially, this argument is that because there was a mistrial in Alex's case in 2010 on the same charges and based on similar facts, the District Attorney should have been on notice that: (1) a conviction of Lester on both charges was impossible, and (2) there was a need for greater training of Assistant District Attorneys in the areas of prescription, statutory affirmative defenses, and ex post facto laws to prevent such false charges from being filed or maintained in the future. However, based upon the complaint and its attachments, it appears that the reason for the mistrial in 2010 was that the jury instructions did not reflect the fact that Alex was charged with Home Improvement Fraud that allegedly occurred under an old statute and an amended statute, resulting in a joint motion for mistrial. <u>See</u> Record Document 1 at ¶ 37.

Thus, the inferences regarding a need for training and supervision that the District Attorney could or should have taken from the single mistrial of one of Lester's co-defendants (the only incident alleged in the complaint that could have provided the District Attorney with notice of such a need) are murky at best. The required training and supervision that Lester alleges was necessary is the same type of nuanced, specific training that the Court in <u>Connick</u> stated District Attorneys are not required to provide. <u>See</u> <u>Connick</u>, 563 U.S. at 67-68. The District Attorney's failure to provide this training, like the failure to provide specific <u>Brady</u> training in <u>Connick</u>, "simply cannot support an

inference of deliberate indifference" necessary to state a <u>Monell</u> claim. <u>Id.</u> at 67. Therefore, Lester's claims against Cox in his official capacity must be dismissed.

### iii.   Lester's State Law Claims against Cox

As stated above, Louisiana law is essentially identical to federal law regarding absolute prosecutorial immunity, so absolute immunity also protects Cox from suit under Lester's state constitutional, IIED, and NIED claims to the extent they are based on acts protected by absolute immunity. <u>See</u> <u>Knapper</u>, 681 So.2d at 950; <u>see</u> <u>Cousin v. Small</u>, 2001 U.S. Dist. LEXIS 7903 at *27 (E.D. La. 2001) (dismissing state tort claims based upon alleged actions that were shielded by absolute immunity).

As discussed above in Section II, A, i, *supra*, Lester has stated a claim for defamation under § 1983. Thus, he has also stated a defamation claim under Louisiana law, as defamation claims under state tort law do not require the same "stigma plus infringement" allegations required to allege a § 1983 claim. To the extent that Lester seeks to base his Louisiana Constitutional violations on Cox's alleged defamation, only La. Const. Art. I, § 2 has any relevance to the injuries suffered as a result of the alleged defamation, as § 2 states that "no person shall be deprived of life, liberty, or property, except by due process of law." IIED claims require "extreme and outrageous" conduct, and it cannot be said that Cox's statement, even if false, was the type of "extreme and outrageous" conduct that can form the basis of an IIED claim. <u>See</u> <u>White v. Monsanto</u>, 585 So.2d 1205, 1209 (La. 1991). When an NIED claim is unaccompanied by physical injury, recovery is only possible when there are "special circumstances involving the likelihood of real and serious mental distress arising from the particular circumstances."

Covington v. Howard, 146 So.3d 933, 937 (La. App. 2 Cir. 08/14/2014). The Court finds that such circumstances are not present here.

Thus, of the state law claims Lester has asserted, only his claims for defamation and a violation of La. Const. Art. I, § 2 may survive Rule 12(b)(6) scrutiny. While Cox is free to raise other common defamation defenses such as the truth of the statement, the lack of the requisite level of fault in making the statement, or qualified immunity at the summary judgment stage, his Rule 12(b)(6) motion must be denied as to these two claims. All other state law claims against Cox are dismissed.

## CONCLUSION

Cox's Rule 12(b)(6) Motion to Dismiss is therefore **GRANTED** with respect to (1) all of Lester's § 1983 claims against Cox in his individual capacity except for defamation; (2) all of Lester's § 1983 claims against Cox in his official capacity; and (3) all of Lester's state law claims against Cox except for defamation and his claim under La. Const. Art. I, § 2 to the extent that it is based upon the alleged defamation. The claims for which the Motion to Dismiss is granted are hereby **DISMISSED WITH PREJUDICE**. With respect to those claims for which the Motion to Dismiss is not granted, the Motion to Dismiss is hereby **DENIED**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this the 26th day of October, 2016.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE